**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DMITRY ZINGER, individually and on behalf of a class of all persons and entities similarly situated, | : | Case No.: 2:26-cv-04287-JMY |
| Plaintiff, | : | |
| v. | : | |
| ADAPTHEALTH CORP. | : | |
| Defendant. | : | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendant AdaptHealth Corp. ("AdaptHealth") sent text message calls to Plaintiff Dmitry Zinger's personal cellular telephone number, which has been listed on the National Do Not Call Registry since 2006. The messages identified AdaptHealth by name, announced a "new order" that Plaintiff never placed, told him to call AdaptHealth, and directed him, through a link to AdaptHealth's website, to download AdaptHealth's mobile app. Plaintiff had no relationship with AdaptHealth. He replied "STOP" and contacted AdaptHealth directly, and AdaptHealth confirmed in writing that same day that his number had been added to its internal Do Not Contact list. More than three months later, he received yet another message, this time from Oxygen One, an entity within the AdaptHealth corporate organization. (ECF No. 8, First Am. Compl. ("FAC") ¶¶ 14-19, 23-33, 35-37, 52, 55.)

AdaptHealth's motion to dismiss (ECF No. 10-1, "MTD") rests on three arguments, each of which courts in this District and elsewhere have already rejected.

*First*, AdaptHealth contends that the TCPA's Do Not Call provisions do not reach text messages at all. Every court in this District to decide that question has held otherwise, including Judge Henry in *Cole*, Judge Murphy in *Newell v. Children's Dental*, Judge Perez in *Newell v. RxLink*, and Judge Savage in *Pero v. Brown-Daub*, as AdaptHealth itself acknowledges. (MTD at 14 n.7.) So has the District of Delaware, *King v. Bon Charge*, 823 F. Supp. 3d 508 (D. Del. 2025), and the District of New Jersey in *Rubin v. Staples, Inc.*, No. 2:25-15515 (WJM), 2026 WL 881651, at *6 (D.N.J. Mar. 31, 2026), construing the very private right of action at issue here. AdaptHealth does not cite a single decision from any court in this Circuit adopting its position. Instead, it rests almost entirely on the Seventh Circuit's decision in *Steidinger v. Blackstone Medical Services*, 182 F.4th 532 (7th Cir. 2026). But *Steidinger* does not bind this Court; it cannot be reconciled with the Third Circuit's own repeated recognition that the TCPA's term "call" "encompasses text messages," *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 118, 117 n.3 (3d Cir. 2018); *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 269 n.2 (3d Cir. 2013); and it adopts the same reasoning that the courts of this District have already considered and rejected. The Central District of California, for one, recently declined to follow *Steidinger* for exactly that reason. *Miller v. S. Brown & Assocs., Inc.*, No. 2:26-CV-01480-MWC-SSC, 2026 WL 2855518, at *4 (C.D. Cal. Sept. 22, 2026).

*Second*, AdaptHealth argues that its messages were not "telephone solicitations" because they did not expressly offer to sell Plaintiff anything, and that Plaintiff has not pled a violation of the internal Do Not Call rules. But the TCPA looks to the purpose of a message, as illuminated by both its content and its context. Messages sent about a "new order" he never placed, which direct him to call AdaptHealth and to visit AdaptHealth's website to download its app, plausibly were sent for the purpose of encouraging the purchase of AdaptHealth's products, as the FAC

alleges. And the internal Do Not Call claim is not close. AdaptHealth confirmed in writing that it had placed Plaintiff's number on its internal list, yet more than three months later another message arrived from within the AdaptHealth organization. That delay far exceeds anything the regulations allow, and it gives rise to a reasonable inference that AdaptHealth lacked adequate procedures for honoring do-not-call requests across its organization.

*Third*, AdaptHealth argues that Plaintiff has not plausibly alleged that AdaptHealth sent the text messages. It does so despite the fact that the calls bear AdaptHealth's own name, announce an AdaptHealth "new order," supply an AdaptHealth number to call back, and send the recipient to AdaptHealth's own website, and despite AdaptHealth itself confirming, in writing, it placed his number on its internal DNC list. Direct identification by name is the strongest indicia of direct liability there is, and courts in this District have held that allegations far thinner than these support a plausible inference of direct liability. *See, e.g.*, *Smith v. Am.-Amicable Life Ins. Co. of Texas*, No. CV 22-333, 2022 WL 1003762, at *2 (E.D. Pa. Apr. 4, 2022).

The motion should be denied in its entirety.

## Background

### A. The statutory and regulatory framework.

Section 227(c) of the Telephone Consumer Protection Act ("TCPA") empowers the FCC to decide whether to create a national Do Not Call List and to determine the rules that will govern it. *See* 47 U.S.C. § 227(c)(1)-(4). The guiding purpose of a Do Not Call List is "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." *Id.* § 227(c)(1). The key operative term there is "telephone solicitations," which are defined in the TCPA as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is

transmitted to any person." *Id.* § 227(a)(4). As one court recently observed, that definition is "more concerned with the purpose of the telephone communications [that are prohibited] than the form in which those communications are transmitted." *Wilson v. Medvidi*, No. 25 Civ. 03996, 2025 WL 2856295, at *3 (N.D. Cal. Oct. 7, 2025); *see, e.g.*, *Hulce v. Zipongo Inc.*, 132 F.4th 493, 497-500 (7th Cir. 2025) (Do Not Call List liability turned on whether a text message had the requisite commercial purpose).

The statute grants the FCC broad discretion to determine the rules governing the Do Not Call List. The statute expressly empowers the FCC to make rules "that the Commission determines are most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c)(1)(E). And, as relevant here, the statute specifies that the FCC's rules must "prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber" on the national Do Not Call List. *Id.* § 227(c)(3)(F). Section 227(c)(5), in turn, grants an express private right of action to any "person who has received more than one telephone call within any 12-month period … in violation of the regulations." 47 U.S.C. § 227(c)(5). That is "a straightforward provision designed to achieve a straightforward result"—to enable "each person to protect his own personal rights" under the Do Not Call List rules. *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 650 (4th Cir. 2019).

The FCC's implementing regulations for the Do Not Call List include 47 C.F.R. § 64.1200(c)(2), which generally prohibits "any telephone solicitation to … [a] residential telephone subscriber who has registered his or her telephone number" on the Do Not Call List. The regulations also require any person or entity that initiates calls for telemarketing purposes to institute and maintain minimum procedures for recording and honoring requests not to receive such calls, and to honor those requests within a reasonable time. *See* 47 C.F.R. § 64.1200(d),

(d)(3). The FCC has determined in a series of orders and in a formal regulation that these rules apply to "calls or text messages to wireless telephone numbers." 47 C.F.R. § 64.1200(e); *see* 18 FCC Rcd. 14014, 14115 ¶ 165 (July 3, 2003); 30 FCC Rcd. 7961, 8020 ¶¶ 115-16 (July 10, 2015); 88 Fed. Reg. 20800, 20802 ¶ 6 (Apr. 7, 2023); 38 FCC Rcd. 12247, 12256-57 ¶ 26 (Dec. 18, 2023).

**B. Plaintiff's allegations.**

Plaintiff uses his telephone number for personal, residential, and household purposes only, and has never used it in connection with any business. (FAC ¶¶ 14-16.) He personally registered that number on the National Do Not Call Registry on June 5, 2006. (FAC ¶ 18.) AdaptHealth is a national home medical equipment company that distributes home medical equipment, medical supplies, and related services throughout the United States, including medical devices for sleep apnea and diabetes management. (FAC ¶¶ 20-21.)

Plaintiff had no established business relationship with AdaptHealth. He had not placed an order with AdaptHealth, had not requested that AdaptHealth obtain, prepare, fill, schedule, or deliver any medical equipment or supplies for him, was not awaiting any order, invoice, delivery, appointment, or other transaction from AdaptHealth, and had not requested information concerning AdaptHealth's products or services. (FAC ¶¶ 19, 23-27.) Nevertheless, on February 12, 2026, Plaintiff received two text messages from AdaptHealth. (FAC ¶¶ 31-32.) One stated: "AdaptHealth has received a new order for you. Please call us at 844-822-3142 between 8:30 am and 5:30 pm ET. Text STOP to opt-out." (FAC ¶ 32.) The other stated: "AdaptHealth has a new order for you that is ready to schedule. Please download our mobile app myAPP at https://adapthealth.com/myapp once you enroll you will be able to self schedule. Text STOP to opt-out". (*Id.*) Plaintiff alleges that the messages attempted to cause him to engage with

AdaptHealth by calling AdaptHealth, downloading its mobile application, and visiting its website concerning products and services he had neither ordered nor requested; that the link in the second message directed him to AdaptHealth's website, where he could purchase and schedule delivery of medical supplies; and that they were sent for the purpose of encouraging the purchase of AdaptHealth's products and services. (FAC ¶¶ 29-30, 52-53, 68-69.)

Plaintiff replied "STOP" to both messages, and in response to one was told: "You have successfully been unsubscribed. You will not receive any more messages from this number." (FAC ¶ 32.) The same day, Plaintiff contacted AdaptHealth directly and asked that his number be placed on its internal Do Not Call list, and AdaptHealth's legal representative confirmed in writing that his number "has been added to AdaptHealth's internal Do Not Contact list." (FAC ¶¶ 35-36, 39-41.) Nevertheless, on May 31, 2026. more than three months later, Plaintiff received another text message, from Oxygen One, Inc., an entity that is part of the AdaptHealth organization: "Oxygen One, Inc: You have an invoice available. Reply 'Y' to receive invoice notifications. Reply 'N' to opt out or HELP for help. Msg & Data rates may apply." (FAC ¶¶ 37, 42-43, 48, 55.) Plaintiff alleges that this continued communication, despite AdaptHealth's written confirmation, plausibly demonstrates that AdaptHealth failed to implement or maintain reasonable procedures for recording, communicating, applying, and enforcing company-specific do-not-call requests across the systems, business units, affiliated entities, and persons used to communicate with consumers on its behalf. (FAC ¶¶ 38, 44-45.)

Plaintiff brings two claims under 47 U.S.C. § 227(c)(5): Count I for violations of the National Do Not Call Registry rule, 47 C.F.R. § 64.1200(c)(2), and Count II for violations of the internal Do Not Call rules, 47 C.F.R. § 64.1200(d). AdaptHealth moved to dismiss Plaintiff's

original complaint, and Plaintiff amended. (ECF Nos. 6, 8.) AdaptHealth now moves to dismiss the FAC. This response follows.

**Legal Standard**

Under Rule 12(b)(6), a court may dismiss a complaint that fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Detailed pleading is not generally required; the Rules demand "only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

In determining whether a claim is plausible, the court must "draw on its judicial experience and common sense." *Connelly*, 809 F.3d at 786-87. After identifying elements to set forth a claim and removing conclusory allegations, the Court must accept all well-pled factual allegations as true and determine if they give rise to relief. *Id.* A complaint may be dismissed only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face," not merely because the defendant proffers some contrary facts. *Twombly*, 550 U.S. at 570. Rule 12(b)(6) is not an appropriate device for testing the truth of what is asserted in the complaint or for determining whether the plaintiff has any evidence to back up what is in the complaint. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002).

## Argument

### I. Section 227(c) of the TCPA reaches telemarketing text messages, which are "calls."

AdaptHealth contends that a single use of the phrase "telephone call" in section 227(c)(5)'s private right of action means that the Do Not Call List rules cannot apply to text messages. (MTD at 5-14.) That's incorrect, as courts within the Third Circuit and many outside it have held. *Wilson v. Easy Spirit, LLC*, No. 3:25-CV-112 (SFR), 2026 U.S. Dist. LEXIS 69059, at *13 (D. Conn. Mar. 31, 2026) (holding the word "call, in th[e § 227(c)] context, means to 'get or try to get into communication' using a telephone. A text message is sent using a cellular telephone to 'get or try to get into communication' with another person"); *Rubin v. Staples, Inc.*, No. 2:25-15515, 2026 U.S. Dist. LEXIS 70359, at *17 (D.N.J. Mar. 31, 2026) ("[T]he Court concludes that "telephone call" can encompass text messages for purposes of § 227(c)(5)"); *Rabbitt v. Rohrman Midwest Motors*, No. 25 C 11312, 2026 U.S. Dist. LEXIS 66266, at *8 (N.D. Ill. Mar. 27, 2026) ("Based on the court's independent examination of the TCPA, it agrees with the FCC that § 227(c)(5) applies to text messages."); *Cole v. C/T Install Am., LLC*, No. 25-3531, 2026 U.S. Dist. LEXIS 63254 (E.D. Pa. Mar. 23, 2026) ("The structure of the entire TCPA leads to the conclusion that §227(c) does include text messages."); *Alvarez v. Fiesta Nissan*, 2026 U.S. Dist. LEXIS 14155, at *10 (S.D. Tex. Jan. 26, 2026) ("[P]lain-language reading suggests that to send a text message is to 'try to get or to get into communication by telephone"); *Mujahid v. Newity*, No. 25 C 8012, 2025 WL 3140725, at *2 (N.D. Ill. Nov. 10, 2025) (DNCR provision applies to text message calls).

The Supreme Court has likewise described the point as undisputed in the context of the TCPA's robocalls provision, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."), as has the Third Circuit, *Dominguez*, 894 F.3d at 117 n.3 ("[U]nder the

TCPA, that term [‘call’] encompasses text messages.”); *Gager*, 727 F.3d at 269 n.2 (holding the TCPA applies to both “voice calls” and “text messages,” and noting that a “text message” is a “call”). And the Ninth Circuit recently reaffirmed, on *de novo* review and without deference to the FCC, that a text message is a “call” within the meaning of the TCPA. *Howard v. Republican Nat’l Comm.*, 164 F.4th 1119, 1123-24 (9th Cir. 2026) (addressing § 227(b)).

**A. The plain meaning of the term “telephone call” includes text messages.**

The starting point is the statute’s text, which confirms that “call” includes text messages. To interpret a statutory term, courts look to the ordinary meaning of the word near in time to the statute’s enactment, including by looking at contemporaneous dictionaries. *See, e.g.*, *Perrin v. United States*, 444 U.S. 37, 42 (1979) (“A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning. Therefore, we look to the ordinary meaning of the term . . . at the time Congress enacted the statute . . . .” (citation omitted)).

Courts have long recognized that the word “call” in the TCPA refers to any attempt to communicate by telephone, including text messages. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953-54 (9th Cir. 2009).

This basic definition of the word “call,” which is the relevant one given the context and the word’s pairing with “telephone” in section 227(c)(5), appears in many dictionaries from around the time of the TCPA’s passage. *See, e.g.*, Random House Webster’s College Dictionary (1991) (“to communicate or try to communicate with by telephone”); Oxford English Dictionary (2d ed. 1989) (“a summons or communication by telephone”). “The contemporary definition of ‘telephone call’ was therefore not limited to oral or vocal communications. It encompassed any

communication made using a telephone." *Wilson v. Better Mortgage Corp.*, No. 25 Civ. 5503, 2025 WL 3493815, at *5 (S.D.N.Y. Dec. 5, 2025).

In fact, other contemporary dictionaries of the era explicitly treat "telephone call" and "call" as synonymous. For instance, the Oxford Encyclopedic English Dictionary defines a "telephone call" as a "call," and defines "call" as "to communicate or converse with by telephone or radio." *See* "call," Oxford Encyclopedic English Dictionary 209 (2d ed. 1991). Under any of these definitions, a "telephone call" is simply a communication made by telephone, which plainly includes text messages sent from one telephone to another. It indicates no preference for voice communication. To "telephone" someone is "to "send (a message) by telephone." *Id.* 1484. These definitions reinforce the understanding that, even in 1991, a "telephone call" need only transmit a "message," not include a vocal component. Fax machines, pagers, teletype machines, and TTY devices are all examples of technologies available in 1991 that transmitted text-based "messages" under that definition.

And courts have long recognized that these definitions, including the definition identified in *Satterfield*, any attempt to communicate with someone by telephone, is the meaning of "telephone call" that Congress would have intended in 1991, when the TCPA was enacted. *See, e.g.*, *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union, Dist. 1199 W.V./Ky./Oh.*, 708 F.3d 737, 742 (6th Cir. 2013); *Better Mortgage Corp.*, 2025 WL 3493815, at *5; *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1007 (N.D. Ill. 2010). Texting is, of course, a means of communicating with someone by telephone. So "text messaging plainly fits within that literal definition of a 'call,' because 'text messaging is a form of communication used primarily between telephones.'" *Howard*, 164 F.4th at 1123-24 (quoting *Satterfield*).

The established definition of "telephone call" in the TCPA therefore readily encompasses texts. Indeed, the Third and Ninth Circuits have said, in cases alleging violations of section 227(b), that text messages to a cellular telephone qualify as calls within the meaning of the statute. *Howard*, 164 F.4th at 1123-24; *Satterfield*, 569 F.3d at 954; *Dominguez*, 894 F.3d at 117 n.3; *Gager*, 727 F.3d at 269 n.2. And, absent contrary evidence, a statutory word or phrase is presumed to bear a consistent meaning throughout a statute. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017). So, the consensus meaning of the word "call" in section 227(b), as encompassing texts, "supports the interpretation that the term 'call' as used in § 227(c) also encompasses 'text messages.'" *Mujahid*, 2025 WL 3140725, at *2.

The meaning of the word "call" is especially clear in the nearby autodialer provisions in section 227(b) of the TCPA. The word "call" is used extensively in those provisions prohibiting automatic dialing technology and robocalls. Most notably, section 227(b) prohibits using autodialer or robocall technology "to make any *call* … to any telephone number assigned to a paging service." 47 U.S.C. § 227(b)(1)(A)(iii). A typical paging device in the early 1990s would have displayed an incoming message as written text—usually displaying a phone number to call.[1] So the use of the word "call" in connection with pagers in section 227(b) establishes "that the term 'call' cannot invoke only the common usage … in which a 'call' refers to oral communication between two parties via telephone." *Lozano*, 702 F. Supp. 2d at 1005; *see also Abbas v. Selling Source, LLC*, No. 09 Civ. 3413, 2009 WL 4884471, at *4 (N.D. Ill. 2009).

The FCC has long endorsed that interpretation of the term "telephone call." The agency determined as early as 2003 that when the TCPA says "[telephone] call," it must mean not just traditional voice calls but also modern text messages. 18 FCC Rcd. 14014, 14115 ¶ 165 (Jul. 3,

---

[1] *See, e.g.*, Paging Network, Inc., Annual Report, 8 (1991), https://perma.cc/W6UW-UEM2 (noting that 92 percent of the company's pagers could "transmit a numeric message such as a telephone or account number").

2003). As the FCC recognized then, the statutory text "encompasses both voice calls and text calls to wireless numbers." *Id.* And the FCC has consistently adhered to that position ever since, explaining in 2023 that "the DNC restrictions have long applied to wireless phones and the Commission and courts have long held that text messages are calls under the TCPA." *In re Targeting & Eliminating Unlawful Text Messages*, 38 FCC Rcd. 2744 (2023). *See* 30 FCC Rcd. at 8020 ¶¶ 115-16; 88 Fed. Reg. at 20802 ¶ 6; 38 FCC Rcd. at 12256-57 ¶ 26.

To be sure, the FCC first interpreted the word "call" to include text messages in the context of the TCPA's prohibitions on autodialed calls in section 227(b). (*See* MTD at 7.) But that is unsurprising, because the word "call" is used more extensively in that part of the statute, whereas section 227(c) mainly uses the defined term "telephone solicitation." *See Medvidi*, 2025 WL 2856295, at *3. The FCC has since confirmed in a formal regulation that its 2003 interpretation of the word "call" also applies to text messages in the Do Not Call List context of section 227, specifically. *See* 47 C.F.R. § 64.1200(e); 38 FCC Rcd. at 12256-57 ¶ 26.

If anything, even though it is only briefly discussed in the relevant order, the FCC's 2003 interpretation of the word "call" to include texts is especially helpful to understanding the word's original meaning as of 1991. *See* 18 FCC Rcd. at 14115 ¶ 165. When Congress originally drafted the TCPA, text messages were not yet mainstream. *See Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015); *Medvidi*, 2025 WL 2856295, at *2. And texting didn't achieve widespread popularity until the 2000s.[2] So the FCC's understanding of "call" in 2003 surely approximated its 1991 meaning more closely than our 2026 intuitions, which reflect a world where texting has been ubiquitous for decades. *Cf. Loper Bright Enters. v. Raimondo*, 603

---

[2] *See, e.g.*, David Crystal, *Txtng: The Gr8 Db8* 4 (2008), https://perma.cc/M2Q3-FH44 ("The average number of texts per GSM customer in 1995 was 0.4 per month; by the end of 2000 it was still only 35."); Meghan Keane, *Texting Overtakes Voice in Mobile Phone Usage*, Wired (Sept. 29, 2008), https://perma.cc/CB7E-EZQZ (noting that the number of text messages surpassed the number of voice calls for the first time in 2007).

U.S. 369, 386 (2024) ("[T]he contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect.").

Indeed, because it has been broadly understood for decades that the word "call" in the TCPA includes texts, courts have commonly treated that interpretation as obvious and uncontroversial. *See, e.g.*, *Campbell-Ewald*, 577 U.S. at 156 ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."); *Warciak*, 949 F.3d at 356 ("Text messages to a cellular telephone qualify as a 'call' within the meaning of the statute."). That has remained true even after the *McLaughlin* and *Loper Bright* decisions that AdaptHealth says (at 7-8) should be causing a sea change. For example, the Ninth Circuit recently revisited the same "statutory construction" question "under de novo review." *Howard*, 164 F.4th at 1123-24. And the Circuit confirmed its prior holding that a "'text message' constitutes a 'call' within the meaning of the TCPA," even without granting any deference to the FCC. *Id.* ("[I]t is clear from *Satterfield*'s substantive analysis that the conclusion would be the same even in the absence of *Chevron* deference.").

So even post-*Loper Bright*, "the significant weight of case authority" supports interpreting "telephone call" to include text messages. *Better Mortg. Corp.*, 2025 WL 3493815, at *9. The FCC's conclusion that "the term 'call' includes a text message" therefore reflects "the plain meaning of the statutory text as it has been understood by consumers, the FCC, and courts since the TCPA's passage." *Medvidi*, 2025 WL 2856295, at *3. The statute's structure independently confirms this plain-meaning reading.

### B. That interpretation of the word "call" aligns section 227(c)'s private right of action with its substantive provisions.

Much of AdaptHealth's argument focuses on the single use of the word "call" in section 227(c)(5). But reading section 227(c)(5)'s private right of action in context with the substantive Do Not Call List provisions of section 227(c) further confirms that text messages are covered.

To see why, start with the core of section 227(c)—its prohibition on "making or transmitting a telephone solicitation to the telephone number of any subscriber" on the Do Not Call List. 47 U.S.C. § 227(c)(3)(F). Text messages, of course, are "ma[de] or transmitt[ed]" to a "telephone number." *Id.* § 227(e)(8)(C). And it is well-established that the residential telephone "subscriber[s]" protected by the Do Not Call List include cell phone subscribers: The FCC determined that cell phone subscribers are covered when it first created the Do Not Call List rules, *see* 18 FCC Rcd. 14014, 14037-39 ¶¶ 33-36 (2003), and courts have overwhelmingly agreed with that interpretation of the statute ever since, *see, e.g.*, *Harriel v. Bealls, Inc.*, 2025 WL 2379617, at *2 (M.D. Fla. 2025); *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 203 & n.4 (S.D.N.Y. 2024) (collecting cases).

The term "telephone solicitation" also clearly encompasses text messages. The statute expressly defines a "telephone solicitation" to mean "a telephone call or message … which is transmitted to any person" for commercial purposes, with certain exceptions not relevant here. 47 U.S.C. § 227(a)(4). A text message, no less than a voice call, can be "transmitted." *See, e.g.*, *Transmit*, Random House Webster's College Dictionary (1991) ("to send a signal by radio waves or by wire"). And the reference to a "call or message" covers texts even more clearly than the word "call" standing alone. As explained above, "the ordinary, contemporary, and common meaning" of the word "call" in the TCPA includes text messages. *Satterfield*, 569 F.3d at 953-54 & n.3; *see supra* Part I.A. And contemporary definitions of the word "message" do too—a

message in 1991 was "[a]ny notice, word, or communication, no matter the mode and no matter how sent." *Message*, Black's Law Dictionary (6th ed. 1990), https://perma.cc/MTC3-H47K.[3] So "call" and "message" both describe communication with a phone, and neither differentiates between oral and written mediums.

AdaptHealth, following *Steidinger*, argues that Congress's use of "telephone call or message" in section 227(a)(4) shows that "telephone call" in section 227(c)(5) must mean something narrower. (MTD at 10-11.) But the only other reference to "calls" in section 227(c) has the same breadth as "telephone solicitations." In section 227(c)(1)(D), Congress directed the FCC to assess whether it needed additional statutory authority "to further restrict telephone solicitations, including those calls exempted under [former] subsection (a)(3) [defining "telephone solicitation"]." So section 227(c)(1)(D)'s reference to "calls exempted under" the definition of "telephone solicitation" presumably mirrored that definition of "call"—which broadly encompasses a "telephone call or message" and thus covers text messages even more clearly than the word "call" standing alone. 47 U.S.C. § 227(a)(4). Even the Seventh Circuit agreed that section 227(c)(1)(D)'s cross-reference "should refer—as it did at enactment—to the definition of telephone solicitation." *Steidinger*, 182 F.4th at 537. It follows that, within section 227(c) itself, Congress described the category of telephone solicitations—which by definition include both a "telephone call or message"—as "calls." That is fatal to the premise, adopted in *Steidinger* and pressed by AdaptHealth, that Congress used "call" in section 227(c) in deliberate contrast to "message." *See id.* at 536-37. If Congress wanted to limit section 227(c)(5) to voice calls, using the word "call" in light of the capacious definition of a "telephone solicitation" would be a strange way to go about it.

---

[3] *See also, e.g.*, *Message*, Random House Webster's College Dictionary (9th ed. 1991) ("a communication delivered in writing, speech, by means of signals, etc."); *Message*, Oxford English Dictionary (2d ed. 1989) ("an oral or written communication sent from one person to another").

The statute's own usage confirms that "call" and "message" are overlapping categories, not mutually exclusive ones. Section 227(b)(1)(B) prohibits initiating a "telephone call" to a residential line "using an artificial or prerecorded voice to deliver a message." 47 U.S.C. § 227(b)(1)(B). In Congress's own usage, then, "call" describes the act of initiating telephone communication and "message" describes what that communication delivers; a single communication can be both. Congress's choice to define "telephone solicitation" to reach any "call or message" shows that it wanted the defined term to sweep broadly, not that every message is something other than a call. The Supreme Court recently rejected reasoning of exactly the kind *Steidinger* employed, declining to give neighboring statutory terms artificially non-overlapping definitions merely to avoid surplusage where ordinary usage showed that the terms overlapped and Congress likely chose "broad, overlapping terms" deliberately. *United States Postal Serv. v. Konan*, 146 S. Ct. 736, 746 (2026). The anti-surplusage canon on which AdaptHealth relies (MTD at 10-11) yields to ordinary meaning, and in ordinary meaning a text message is both a "call" and a "message."

Section 227(c)(5) itself points the same way. The very paragraph that creates the private right of action makes it an affirmative defense that the defendant "has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). Because "telephone solicitation" is a defined term that expressly includes a "message," *id.* § 227(a)(4), Congress's use of that term within the same paragraph is strong evidence that section 227(c)(5) enforces subsection (c)'s telephone-solicitation rules as a whole—not an audio-only subset of them. *Steidinger*'s construction produces an unnatural mismatch, in which the statutory defense addresses a broader category of communications than

the liability to which it is a defense. Nor does the meaningful-variation canon compel *Steidinger*'s result. *See* 182 F.4th at 536. The variation in wording is readily explained without giving "call" two different meanings: Congress used "telephone solicitation" to describe the class of regulated marketing communications, and "telephone call" to specify which communications count toward the more-than-one-in-twelve-months threshold for bringing suit. That reading gives each term work to do while still encompassing text messages, which are both calls and messages.

Recently, Judge Gettleman explained the interplay of Section 227(c)(1) with Section 227(c)(5) of the TCPA in this regard in *Rabbitt v. Rohrman Midwest Motors, Inc.*, No. 25 C 11312, 2026 WL 851279, at *3 (N.D. Ill. Mar. 27, 2026) (cleaned up):

> The better reading of § 227(c)(5) recognizes that it is part of a statutory scheme that provides a private right of action to individuals who are the victims of multiple violations of the regulations promulgated by the FCC under § 227(c)(1) within a 12-month period. . . . Congress directed the FCC to develop these regulations to "protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." § 227(c)(1). The FCC did so, promulgating numerous regulations including C.F.R. § 64.1200(e), which specifically applies C.F.R. § 64.1200(c) and (d) to text messages. When interpreting a statute, the court is tasked with acting as the faithful agent of Congress. . . . Despite its literalist textual appeal, the court cannot accept defendant's reading of § 227(c)(1) because it would undercut Congress's otherwise coherent regulatory scheme for a reason that neither defendant nor this court can articulate. Based on the court's independent examination of the TCPA, it agrees with the FCC that § 227(c)(5) applies to text messages.

*Steidinger* set section 64.1200(e) aside on the ground that the FCC promulgated it under subsection (c)'s general rulemaking provisions rather than under section 227(c)(5). See 182 F.4th at 538. But that gets the relationship backwards. Section 227(c)(5) is an enforcement provision, not a grant of rulemaking power; the "regulations prescribed under this subsection" whose violation it makes actionable necessarily arise under the preceding paragraphs. 47 U.S.C. § 227(c)(5). That express cross-reference makes subsection (c)'s regulations an element of the

cause of action. The FCC's rule does not create a private right of action—Congress did—but it does define the conduct that violates the regulations Congress authorized private plaintiffs to enforce, and it expressly reaches "text messages to wireless telephone numbers." 47 C.F.R. § 64.1200(e). Under *Steidinger*, then, the FCC's subsection (c) rules prohibit telemarketing texts to numbers on the Registry, yet the consumer who receives them could not invoke the remedy Congress attached to violations of those very rules. Nothing in the statute suggests Congress built that gap into its enforcement scheme.

Finally, the purpose of the Do Not Call List provisions further supports that interpretation. Congress's stated goal was "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). "[A] voice message or a text message are not distinguishable in terms of being an invasion of privacy." *Satterfield*, 569 F.3d at 954; *accord Howard*, 164 F.4th at 1124; *Mujahid*, 2025 WL 3140725, at *2; *Medvidi*, 2025 WL 2856295, at *3; *Wilson v. Skopos Fin., LLC*, No. 25 Civ. 00376, 2025 WL 2029274, at *4 (D. Or. Jul. 21, 2025). Indeed, nothing in the statute gives any suggestion that Congress thought "oral messages were more invasive or objectionable than written ones." *Medvidi*, 2025 WL 2856295, at *3.

### C. The Third Circuit and every court in this District to consider the question have held that text messages are calls.

Consistent with the statute's text and structure, courts, particularly within the Third Circuit, have uniformly held that text messages qualify as calls under the TCPA. AdaptHealth's position would undermine the TCPA. If text messages were excluded from § 227(c)'s protections, telemarketers could simply bypass the Registry by shifting from voice calls to texts. The unanimous voice of federal courts in this Circuit have gotten the analysis correct.

As the Third Circuit has explained, "[a]lthough the text of the statute refers only to 'calls,' we have held that, *under the TCPA*, that term encompasses text messages." *Dominguez*, 894 F.3d at 117 n.3 (citing *Gager*, 727 F.3d at 269 n.2) (emphasis added). Indeed, the Third Circuit has looked to the *Satterfield* decision for guidance. *See Gager*, 727 F.3d at 269 n.2 (noting "[t]he TCPA's prohibition on automated dialing applies to both voice calls and text messages" and citing *Satterfield*). As noted above, the Ninth Circuit recently reaffirmed *Satterfield*'s central holding, even absent *Chevron* deference.

District courts throughout this Circuit have long applied that holding. *See Brown v. Rita's Water Ice Franchise Co. LLC*, 242 F. Supp. 3d 356, 362 n.30 (E.D. Pa. 2017) ("Text messages are 'calls' within the meaning of the TCPA."); *Prukala v. Elle*, 11 F. Supp. 3d 443, 449 n.6 (M.D. Pa. 2014) (quoting *Gager* for the principle that "[t]he TCPA's prohibition on automated dialing applies to both voice calls and text messages"); *Bradshaw v. CHW Grp., Inc.*, 763 F. Supp. 3d 641, 649, 648 n.5 (D.N.J. 2025) ("Text messages are considered 'calls' for these purposes."). And they have applied the same understanding to the Do Not Call private right of action at issue here. In *King v. Bon Charge*, for example, the District of Delaware held that a text message counts as a "call" for purposes of section 227(c)(5)'s private right of action for any person who has received more than one telephone call within any 12-month period. *King*, 823 F. Supp. 3d 508. The courts of this District have done the same.

On March 23, 2026, in an opinion by Judge Catherine Henry, this Court denied a motion to dismiss raising materially identical arguments, including that text messages are not "calls" under the TCPA. *Cole*, 2026 U.S. Dist. LEXIS 63254.

The result in *Cole* is consistent with the other decisions from the Eastern District of Pennsylvania, which denied nearly identical motions to dismiss raising the same contention that

text messages fall outside the TCPA's protections. *See Newell v. Children's Dental Health Assocs., LLC*, No. 2:25-cv-05238, ECF No. 25, 2026 WL 927378, at *3 (E.D. Pa. Apr. 6, 2026) (Murphy, J.); *Newell v. RxLink Inc.*, No. 2:25-cv-4270, ECF No. 43 (E.D. Pa. Mar. 12, 2026) (Perez, J.). After considering full briefing and multiple rounds of supplementation, the courts rejected the argument outright and allowed the claims to proceed. And since then, yet another court in this District has reached the same result. *See Pero v. Brown-Daub Chevrolet of Nazareth*, No. CV 25-7016, 2026 WL 1747214, at *1 (E.D. Pa. June 17, 2026) (concluding "that text messages are calls for purposes of Section 227(c) of the TCPA"). AdaptHealth concedes as much, acknowledging that *Pero*, *Children's Dental*, and *Cole* all rejected its position. (MTD at 13-14 & n.7.)

The District of New Jersey has reached the same conclusion. On March 31, 2026, that Court addressed similar arguments in *Rubin v. Staples, Inc.*, Civ. No. 2:25-15515, 2026 U.S. Dist. LEXIS 70359 (D.N.J. Mar. 31, 2026). While the court ultimately dismissed certain claims on other grounds, Judge Martini expressly recognized that text messages constitute "calls" under the TCPA and rejected an argument, like AdaptHealth's here, that section 227(e)'s separate treatment of text messages shows that they are not "calls" under section 227(c) (*see* MTD at 9-10):

> Subsection (e)(8)'s definitions are, however, expressly for purposes of subsection (e), which addresses prohibitions on misleading or inaccurate caller identification information. In contrast, the definition of "telephone solicitations" applies to the entire section rather than just subsection (a). Staples fails to show that Congress's definition applicable only to subsection (e) undermines Congress's express intent to protect residential telephone subscribers from unwanted "telephone solicitations," which include both calls and messages.

*Id.* at *14-17. Taken together, these decisions, from the Third Circuit itself and from district courts in Pennsylvania, New Jersey, and Delaware, confirm that AdaptHealth's position is not

only unsupported but has been repeatedly rejected. AdaptHealth does not identify a single court in this Circuit that has adopted it. This Court should do the same as its colleagues.

### D. *Steidinger* does not change the analysis, and AdaptHealth's arguments for a narrower interpretation are unpersuasive.

#### 1. *Steidinger* is not binding and is unpersuasive.

AdaptHealth's principal response is that the Seventh Circuit "recently became the first appellate court to rule on this issue," and that "in the absence of contrary binding Third Circuit authority, this Court should adopt its sound reasoning." (MTD at 5-6.) That argument fails.

*First*, *Steidinger* is an out-of-circuit decision that does not bind this Court, and the Third Circuit has already construed the word at issue. It has held, and since reaffirmed, that the TCPA's term "call" "encompasses text messages." *Dominguez*, 894 F.3d at 117 n.3; *Gager*, 727 F.3d at 269 n.2. Absent contrary evidence, a statutory word or phrase is presumed to bear a consistent meaning throughout a statute. *Henson*, 582 U.S. at 85. That is precisely why Judge Henry, applying this Circuit's construction, relied on the fact that neighboring subsections of the same statute use identical language. *Cole*, 2026 U.S. Dist. LEXIS 63254.

Nor is *Steidinger*'s reasoning new to this District. *Steidinger* affirmed the district court's decision in *Jones v. Blackstone Med. Servs., LLC*, 792 F. Supp. 3d 894 (C.D. Ill. 2025), *see Steidinger*, 182 F.4th at 534-35, and the courts of this District considered *Jones* and declined to follow it. *See Cole*, 2026 U.S. Dist. LEXIS 63254. The out-of-circuit district courts that AdaptHealth cites for having "f[ound] *Steidinger* persuasive" and "appl[ied] it in the absence of binding authority" (MTD at 6 (discussing *Rush* and *Card*)) were not operating against that backdrop. This Court is. The contrast is illustrated by *Miller*, decided after AdaptHealth filed its motion. There, the defendant asked the court to apply "the identical statutory interpretation analysis of *Steidinger*" to hold that section 227(c)(5) does not reach text messages. 2026 WL

2855518, at *3-4. The court declined, explaining that applying *Steidinger* "would necessarily require this Court to reject" its own circuit's precedent treating text messages as calls, and it held that "[t]ext messages constitute a call under § 227(c)." *Id.* at *4 (quoting *Hopkins v. Homelight, Inc.*, No. 26-cv-5017-BHS, 2026 WL 2017320, at *4 (W.D. Wash. July 13, 2026)). The same course is warranted here, where the Third Circuit has likewise construed "call" to encompass text messages and every court in this District has applied that construction to section 227(c).

*Second*, *Steidinger* declined to follow the decisions of other courts of appeals holding that text messages are "calls" under the TCPA, including the Ninth Circuit's decision in *Howard*, and distinguished those decisions on the grounds that they arose under section 227(b) and relied on *Campbell-Ewald*. 182 F.4th at 537-38. Neither ground holds up. The reliance critique does not reach *Howard*, which post-dates *Loper Bright* and reaffirmed on *de novo* review, without deference to the FCC, that "a text message is properly deemed to be a 'call' within the *meaning of the TCPA*." *Id.* at 538 (emphasis added) (quoting *Howard*, 164 F.4th at 1124). And the section 227(b) distinction assumes its own conclusion. Section 227(b), like section 227(c)(5), uses the phrase "telephone call." *See* 47 U.S.C. § 227(b)(1)(B). *Steidinger*'s answer, that the two subsections' private rights of action are framed differently, 182 F.4th at 539, fails to address what the shared term "telephone call" means. Worse, *Steidinger* accepted that a text message is a "call" under section 227(b) while holding that the same text is not a "telephone call" under section 227(c)(5). See 182 F.4th at 538-39. That reading is internally inconsistent, and courts have recognized that it would be incongruous to treat a text message as a "call" under one subsection of the TCPA but not another. *See Miller v. Direct Gen. Ins. Agency, Inc*, No. 2:26-CV-01480-MWC-SSC, 2026 WL 1708531, at *4 (C.D. Cal. June 8, 2026) ("by the same logic

and reasoning enunciated in *Howard*, text messages must constitute 'calls' under Section 227(c)(5) as well").

*Third*, *Steidinger* rests on the same reasoning that the courts of this District have already considered and rejected. The Seventh Circuit reasoned that, under a 1991 dictionary, a telephone was "[a]n instrument for reproducing sounds at a distance," so a "telephone call" "referred to communication via sound," and "[t]ext messages do not reproduce sounds." 182 F.4th at 535-36. It reasoned that section 227(c)(5) "doesn't mention telephone messages, nor does it use the more encompassing term, telephone solicitation," *id.* at 536; that because section 227(a)(4) refers to a "call or message," text messages "are better understood as messages, not calls," like the fax "message[s]" addressed in section 227(d)(1), *id.* at 536-37; that Congress amended section 227(e), but not section 227(c), to address text messages in 2018, *id.* at 539; and that unwanted texts, unlike calls, do not seize telephone lines needed for emergencies, *id.* at 540. Each of those arguments was made in *Jones* and the district court decisions following it, and each is answered below. A new signature on the same reasoning does not make it more persuasive.

**2. A "telephone call" in 1991 was not limited to "communication via sound."**

The foundation of *Steidinger*, and of AdaptHealth's motion, is that in 1991, a "telephone call" "referred to communication via sound." *Steidinger*, 182 F.4th at 536; MTD at 13. But the very dictionary on which *Steidinger* relied defined "call" as "to get or try to get into communication by telephone," *Steidinger*, 182 F.4th at 536, a definition that says nothing about sound and that mirrors the definition adopted in *Satterfield* and *Howard*. *See supra* Part I.A. *Steidinger* reached a sound-only result only by importing a definition of the device, "telephone," rather than the communication, "call." But "telephone" identifies the *instrument* through which the communication occurs; it does not convert "call" into a synonym for *audible conversation*.

Put the two definitions together, and to make a "telephone call" is "to 'get or try to get into communication' with an 'instrument for producing sounds at a distance.' A text message therefore falls reasonably within the literal language of the statute." *Alvarez v. Fiesta Nissan, Inc.*, No. 7:25-CV-00343, 2026 WL 202930, at *5 (S.D. Tex. Jan. 26, 2026) (emphasis added); *see also Pero v. Brown-Daub Chevrolet of Nazareth*, No. CV 25-7016, 2026 WL 1747214, at *2 (E.D. Pa. June 17, 2026) ("A text message is a communication (message) transmitted by a telephone (an agency)."). What makes a communication a telephone call is the *use of an instrument capable of reproducing sounds to communicate*, not whether the communication is audible. The sound-only premise is also wrong as a textual-techno-historical matter, and the TCPA itself proves it. As explained above, the original TCPA prohibited using autodialer or robocall technology "to make any call … to any telephone number assigned to a paging service," 47 U.S.C. § 227(b)(1)(A)(iii), and a typical pager of the era displayed an incoming message as written text. *See supra* Part I.A. If a text "call" to a pager can violate the TCPA, a text "call" to a cell phone can too, because it shows "that the term 'call' cannot invoke only the common usage … in which a 'call' refers to oral communication between two parties via telephone." *Lozano*, 702 F. Supp. 2d at 1004-05.

The sound-only premise also systematically excludes the experiences and needs of deaf and hard-of-hearing individuals, who have used text-based communication for telephone calls since long before the TCPA was enacted in 1991. The *Davis* court's assertion that "no normal person refers to a text message, or thinks of a text message, as a 'call,'" is flawed in that it excludes those who have used text-based communication to make "telephone calls" long before 1991. *Davis v. CVS Pharmacy, Inc.*, 797 F. Supp. 3d 1270, 1273 (N.D. Fla. 2025). For millions of Americans who rely on TTY/TDD (teletypewriter/telecommunications device for the deaf)

technology or have other hearing disabilities, text messages are not just "telephone calls," they are often the only way these individuals can make and receive "telephone calls." Under the reasoning of *Steidinger* and the district court decisions AdaptHealth cites, deaf individuals would have had no private right of action under § 227(c)(5), even in 1991, because they did not receive "telephone calls," they received text message calls.

TTY/TDD devices allow deaf and hard-of-hearing individuals to communicate using telephones by typing text messages that are transmitted to a compatible receiving device (like a smart phone) or to a relay operator. This technology has been available since the 1960s, and grew out of the same technology, teletype machines, that transmitted written words using telephone lines. By 1991, TTY/TDD devices were widely used by the deaf community, and their use was explicitly recognized in federal telecommunications law. The Americans with Disabilities Act, enacted in 1990, just one year before the TCPA, required telephone companies to provide text-based telephone services to deaf and hard of hearing individuals on equal footing to "voice transmission services." 47 U.S.C. § 225. Congress was acutely aware in 1991 that "telephone calls" could be, and for millions of deaf Americans, routinely were, conducted through text-based communication. Indeed, it so recognized when it used the term "voice transmission services" to refer to the particular subset of telephone calls sent using a voice, as opposed to text-based "telecommunications relay services." And Congress explicitly referred to such text-based services as "calls," for example, in prohibiting relay operators from "keeping records of the content of any such conversation beyond the duration of the *call*." 47 U.S.C. § 225(d)(5).

"The contemporary definition of 'telephone call' was therefore not limited to oral or vocal communications. It encompassed any communication made using a telephone." *Better*

*Mortg.*, 2025 WL 3493815, at *5. When Congress enacted the TCPA in 1991, it was legislating against the backdrop of the recently enacted ADA and the longstanding use of text-based telephone call technology used by the deaf community and by the millions of individuals and businesses who had teletypewriters, pagers, and telex machines alike. Congress chose to use the term "telephone call" rather than "voice call" or "spoken communication" in the TCPA, just as in the ADA, where it recognized text "calls." That choice should be understood as inclusive of all forms of communication sent and received by telephones, including text-based telephone "calls."

**3. Modern parlance does not control the meaning of a 1991 statute.**

AdaptHealth next insists that "call" cannot encompass text messages because in 1991 text messages did not exist. (MTD at 6-7.) That's not how statutory interpretation works, as even *Steidinger* recognized. *See* 182 F.4th at 535 ("[W]hile every statute's meaning is fixed at the time of enactment, new applications may arise in light of changes in the world.") (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018)); *id.* at 536 (acknowledging that "§ 227(c)(5) covers more than telephone calls as they existed in 1991"). Courts look to statutes' ordinary "meaning at the time of … adoption" to interpret them, not "modern intuition." *New Prime, Inc. v. Oliveira*, 586 U.S. 105, 114 (2019). And although "every statute's meaning is fixed at the time of enactment," there is nothing odd about old text finding "new applications" as times change. *Wis. Cent. Ltd.*, 585 U.S. at 284. Consider a 1991 law that bars "vehicles" from a park. That law applies equally to Cybertrucks and to sedans, even though the former didn't exist at the time. So, too, here: The TCPA prohibits sending text message calls to phone numbers on the national Do Not Call List, just as it prohibits traditional voice calls.

In *New Prime*, the Supreme Court explained that the statutory term "contracts of employment" in the Federal Arbitration Act nowadays "might call to mind only agreements

between employers and employees," and thus exclude independent contractors. 586 U.S. at 114. But that "modern intuition" did not match the "evidence of the term's meaning at the time of the Act's adoption," which revealed that "'contract of employment' usually meant nothing more than an agreement to perform work." *Id.* The Supreme Court therefore held that the statutory exception at issue reached not just conventional "employees," as modern parlance might suggest, but also modern independent contractors, as definitions from the time of the statute's enactment showed. *See id.* at 114-16. *New Prime* illustrates that when there's a mismatch between modern intuitions and the original meaning at the time of enactment, the latter is what controls—not how an "ordinary person would think of a text message" today. *Davis*, 797 F. Supp. 3d at 1273.

In *Alvarez v. Fiesta Nissan, Inc.*, No. 7:25-CV-00343, 2026 WL 202930 (S.D. Tex. Jan. 26, 2026), the court drew on Judge Easterbrook's decision in *In re Erickson*, 815 F.2d 1090 (7th Cir. 1987), which found that a statutory exemption for a farmer's "mower" embraced later-developed, tractor-mounted haybines because "[a] statutory word of description does not designate a particular item . . . but a class of things that share some important feature." *Alvarez*, 2026 WL 202930, at *4-5 (quoting *Erickson*, 815 F.2d at 1092). Applying that reasoning, the court concluded that "[j]ust as a mower that both cuts and conditions hay is still a mower, a telephone which communicates texts and voice is still a telephone." *Id.* The same court identified the flaw in the sound-only reading: if "telephone" were defined absolutely by its 1991 sound-transmission capability, then even an otherwise unlawful voice call placed from a modern telephone, nearly all of which can text, among many other things, would fall outside section 227(c)(5). *Id.* That a 1991 statute reaches communications Congress did not specifically anticipate "does not demonstrate ambiguity. It demonstrates breadth." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (citation and internal quotation marks omitted).

*Steidinger* invoked *Erickson* for the caution that "[t]oo much 'liberality' will undermine the statute as surely as too literal an interpretation would." 182 F.4th at 536 (quoting *Erickson*, 815 F.2d at 1094). But no liberality is required here. Reading "call" as contemporaneous dictionaries, including *Steidinger*'s own, defined it, as an attempt "to get or try to get into communication by telephone," *id.*, simply applies the 1991 meaning to a new form of telephone communication. That is the ordinary operation of *Wisconsin Central*, not statutory expansion.

There's nothing unusual about that. "While every statute's meaning is fixed at the time of enactment," it is commonplace that "new applications may arise in light of changes in the world." *Wis. Cent. Ltd.*, 585 U.S. at 284. "In determining whether section 227(c) applies to text messages, the Court looks to the plain meaning of the text rather than the specific facts or technology that Congress may have had in mind in 1991 at the time of the TCPA's passage." *Medvidi*, 2025 WL 2856295, at *2. The 1991 meaning of "telephone call," which "refers to both oral and written communications," is what matters. *Id.*; *see Lozano*, 702 F. Supp. 2d at 1007. For the same reason, AdaptHealth is wrong that recognizing this breadth would "rewrite" the statute to "update it for modern technology." (MTD at 6.) Although courts cannot rewrite a statute to update it to account for modern technology, *Facebook, Inc. v. Duguid*, 592 U.S. 395, 397 (2021), because the statute already covers text messages under a proper interpretation of the word "call," there is no need to rewrite anything.

#### 4. The word "telephone," the neighboring provisions, and AdaptHealth's hypotheticals do not support its reading.

AdaptHealth, again tracking *Steidinger*, argues that section 227(b) and section 227(c) "contain different language," that section 227(b) uses "call" as a verb while section 227(c)(5) uses it as a noun, and that the modifier "telephone" in section 227(c)(5) narrows the phrase to voice communications. (MTD at 12-13.) But reading the word "call" differently in section

227(c)(5) than in section 227(b) would make no sense. Absent good reason to think otherwise, "identical words used in different parts of the same statute" carry "the same meaning." *Henson*, 582 U.S. at 85. *Accord Monsalvo v. Bondi*, 604 U.S. 712, 726 (2025). And AdaptHealth's contrast between "any call" in section 227(b)(1)(A) and "telephone call" in section 227(c)(5) overlooks that section 227(b) *itself uses both formulations*, *compare* 47 U.S.C. § 227(b)(1)(A), *with id.* § 227(b)(1)(B), so AdaptHealth's reading would require construing section 227(b) inconsistently with itself. As the FCC recently explained, it would be "anomalous" to give the word "call" a narrower meaning in section 227(c)(5) than it has elsewhere in the TCPA. 38 FCC Rcd. at 12257 ¶ 27. Congress would not have excluded text messages in section 227(c)(5) by using a term that in section 227(b) includes them.

Nor does adding the modifier "telephone" change anything. A text is plainly a "telephone" communication: it is sent to a "telephone number," just like other transmissions that can violate the Do Not Call List rules. *See* 47 U.S.C. § 227(c)(3)(F). The court in *Taha v. Momentive Software, Inc.*, 2026 U.S. Dist. LEXIS 54376, at *7-8 (C.D. Cal. Mar. 11, 2026), squarely rejected this argument, observing that "'Telephone' is even used in the dictionary definition of 'call' relied upon by the *Satterfield* and *Howard* courts," and that "had Congress intended to eliminate textual communications from § 227(c)(5) it would have used the phrase 'voice call,' rather than 'telephone call,'" including as it did in the ADA.

This Court should hold the same. And AdaptHealth's argument that a "call" must be limited to auditory communications because the term appears alongside words like "voice" elsewhere in the statute rests on a flawed premise that actually supports Plaintiff. The provisions in 47 U.S.C. § 227(b)(1)(A)-(B) do not define "call" at all; they regulate certain *types* of "calls," including those made using an "artificial or prerecorded voice." That phrase does not describe *all*

calls but rather identifies one subset of prohibited conduct, those using a certain type of voice. Congress made it unlawful "to make any call" using certain technologies or methods, including but not limited to artificial or prerecorded voices. 47 U.S.C. § 227(b)(1)(A). Thus, the presence of "voice" in those provisions shows only that some calls involve sound, not that all calls must. If anything, the statute's phrasing demonstrates that "call" is the broader category, and "voice" describes just one type within it.

AdaptHealth also argues that Congress has "drawn technology-specific distinctions within the TCPA," pointing to the separate treatment of fax advertisements, and warns that reading "telephone call" to include texts would "sweep in faxes" and "emails." (MTD at 8-12 & n.5.) But the fact that Congress wrote a dedicated rule for unsolicited fax advertisements, 47 U.S.C. § 227(b)(1)(C), says nothing about whether the general term "call" excludes a text-based communication that Congress did not separately address in 1991. And AdaptHealth's parade of horribles fails because emails and app-based communications are not sent to a "telephone number" using a telephone network and are not "telephone calls" at all. A Do Not Call List violation occurs only when a prohibited "telephone solicitation" is directed to a listed "telephone number." 47 U.S.C. § 227(c)(3)(F). An e-mail address is not a "telephone number," so merely receiving an e-mail on a phone doesn't make it a TCPA violation. The same goes for app alerts, which are delivered through an app, not a phone number.

Finally, AdaptHealth's attempt to distinguish text messages on the ground that they do not require a person to "pick up a call, listen to a voice, or tie up their phone's line" (MTD at 12 n.6) ignores the very privacy interests the TCPA was enacted to protect. The statute targets unwanted intrusions into the home and personal sphere, and courts have consistently recognized that unsolicited text messages inflict the same nuisance and invasion of privacy as unwanted

calls. *See Satterfield*, 569 F.3d at 954. A text message call, like a ringing phone, demands the recipient's attention and intrudes upon the recipient's seclusion. *Steidinger* suggested that section 227(c)(5) might reasonably exclude texts because Congress also found that telemarketing calls can seize telephone lines needed for emergencies, 182 F.4th at 540, but the stated purpose of the Do Not Call provisions is privacy: "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Unwanted texts invade that interest no less than unwanted voice calls. Treating text messages as "calls" under the TCPA does not create incoherence; it fulfills the statute's purpose.

**E. Any doubt that section 227(c) covers text messages should be resolved by deference to the FCC's longstanding interpretation.**

The best reading of the statute is that the word "call" includes texts. But if there's any doubt about that, the FCC's interpretation should resolve it. That's because Congress expressly delegated authority to the FCC to "fill up the details" of the Do Not Call List rules. *Loper Bright*, 603 U.S. at 395. As a number of district courts have held post-*Loper Bright*, section 227(c) "explicitly delegates such authority." *Skopos*, 2025 WL 2029274, at *4; *see Mey v. Liberty Home Guard, LLC*, No. 23-281, 2026 U.S. Dist. LEXIS 739, at *15, *19 (N.D. W. Va. Jan. 5, 2026) (explaining section 227(c) "expressly delegated rulemaking authority" such that even "[u]nder *Loper Bright*," the FCC's interpretation is entitled to "deferential review").

To be sure, mere statutory ambiguity is no longer automatic cause to defer to an agency. *See Loper Bright*, 603 U.S. at 412-13 (overruling *Chevron*). And district courts are not bound by the Hobbs Act to adopt FCC interpretations; they can and should make their own assessment of the statute. *See McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025). AdaptHealth says this means no deference is permitted, so courts can now ignore the FCC's longstanding interpretation. (MTD at 7-8.) But that's incorrect. Sometimes "the best

reading of a statute is that it delegates discretionary authority to an agency." *Loper Bright*, 603 U.S. at 395. Courts thus still afford deference to agency interpretations when a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term," tasks an agency "to fill up the details of a statutory scheme," or tells an agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Id.* at 394-95. In that case, a court's role is merely to "fix[] the boundaries" of agency authority and ensure "reasoned decisionmaking" within them. *Id.* at 395.

Section 227(c) is an express delegation of that sort. Congress didn't write the Do Not Call List rules itself. Instead, it tasked the FCC with evaluating alternative approaches based on (among other things) open-ended criteria such as "effectiveness in protecting … privacy rights" and "other advantages and disadvantages." 47 U.S.C. § 227(c)(1)(A). And it empowered the FCC to make rules "that the Commission determines are most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c)(1)(E). That confers discretionary authority to "fill up the details," using open-ended language that bestows "flexibility" to best effectuate the TCPA's goals. *Loper Bright*, 603 U.S. at 395; *see Hulce*, 132 F.4th at 497 n.1 (noting the FCC's "delegated authority" to make Do Not Call List rules). In the telecommunications context, especially, an express delegation like this one is evidence that Congress expected technology "to evolve and therefore charged the [FCC] with the continuing obligation to define it." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 718 (D.C. Cir. 2016).

AdaptHealth's contrary contention, that the FCC's authority under section 227(c) lapsed nine months after December 20, 1991, such that "any DNC regulations enacted by the FCC thereafter exceeded the FCC's limited rule making authority" (MTD at 7), proves far too much. Section 227(c)(2) set a deadline for the FCC to conclude its initial rulemaking; it did not strip the

agency of the continuing, open-ended authority conferred by section 227(c)(1)(E) and (c)(3). Indeed, the FCC did not create the national Do Not Call List rules on which Count I is based until 2003, when it also determined that those rules protect wireless subscribers. *See* 18 FCC Rcd. 14014, 14037-39 ¶¶ 33-36 (2003). If AdaptHealth were right, the Registry rules at the heart of Count I, and their application to cell phones, would be *ultra vires*. That cannot be the case. *Fla. E. Coast Ry. LLC v. Fed. R.R. Admin.*, 186 F.4th 822, 849-50 (11th Cir. 2026) (regulatory deadlines that do not specify consequences for noncompliance merely act as an inducement to prompt action); *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158 (2003) (untimely action still valid); *United States v. James Daniel Good Real Property*, 510 U.S. 43, 63 (1993) ("[I]f a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction.").

Exercising its expressly delegated authority, the FCC has reasonably explained that prohibiting texts to numbers on the Do Not Call List "make[s] … enforcement easier" and "eliminate[s] any potential confusion in the industry." 38 FCC Rcd. at 12256-57 ¶¶ 26-27 & n.59. That conclusion aligns with the FCC's determination that cell phone numbers may be listed, and that the word "call" confers protection from unwanted text messages in other TCPA contexts. *Id.* ¶ 27. Moreover, the FCC has consistently adhered to that understanding of the word "call" for more than two decades, dating back to the earliest years of the technology. *See* 18 FCC Rcd. at 14115 ¶ 165; 30 FCC Rcd. at 8020 ¶¶ 115-16. That conclusion is "reasonable and reasonably explained," and therefore warrants deference. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025).

Relatedly, AdaptHealth says that the 2018 amendments to section 227(e), which distinguish between "a call made using a voice service" and "a text message sent using a text

messaging service," show that Congress knows how to differentiate between the technologies. (MTD at 9-10.) As an initial matter, that reading discounts the fact that Congress explicitly directed that nothing in section 227(e) "shall be construed to modify, limit, or otherwise affect any rule or order adopted by the [FCC] in connection with [the TCPA]." Consolidated Appropriations Act of 2018, 132 Stat. at 1094. That includes the judicial decisions and FCC rules and orders that made clear that "call" in section 227 includes "text messages." *See* 18 FCC Rcd. at 14115 ¶ 165; *Satterfield*, 569 F.3d at 954. And as Judge Gettleman explained, this very action by Congress is an example of statutory *stare decisis* in which Congress implicitly *endorsed* the prevailing view at the time that "text messages" were "telephone calls":

> That Congress did not change anything about § 227(c) in the 2018 amendments can be read to represent exactly the opposite of what defendant advocates. In light of the regulatory history and case law that was known to Congress in 2018, Congress had the option to take affirmative action to exclude text messages from § 227(c)'s coverage. Congress did not do so. If Congress's inaction in 2018 is to be ascribed any meaning, the court interprets it as an acceptance of the existing case law and regulations that applied § 227(c) to text messages. This read on Congress's inaction is in harmony with the oft-repeated principle that statutory stare decisis is particularly strong, because Congress can change what the courts have concluded.

*Rabbitt*, 2026 WL 851279, at *3-4 (cleaned up). Other courts have agreed. *See Children's Dental*, 2026 WL 927378, at *6 ("Congress expressly addresses its concerns about 'caller identification information' to both 'voice' and 'text' services. . . . Thus, the face of § 227(e) further confirms our view that a 'call' can implicate a voice conversation or a text conversation.") (cleaned up); *Wilson v. Easy Spirit, LLC*, No. 3:25-CV-112 (SFR), 2026 WL 884170, at *8 (D. Conn. Mar. 31, 2026) ("the legislative history of the 2018 Amendments contains no evidence that Congress discussed the impact of the proposed Amendments on §

277(c)(5) [sic] or considered the private right of action at all when it passed the 2018 TCPA Amendments.").

Alternatively, the FCC's interpretation should, at the very least, be accorded "great weight." *Loper Bright*, 603 U.S. at 388. The FCC's position is grounded in the agency's expertise, consistent across decades, and well-reasoned. Those are the hallmarks of agency action with the "power to persuade." *Id.*; *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The FCC's longstanding and consistent interpretation of the word "call" is thus an "informed judgment" to which this Court can "properly resort for guidance." *Loper Bright*, 603 U.S. at 388 (quoting *Skidmore*, 323 U.S. at 139-40); *see Medvidi*, 2025 WL 2856295, at *3. Whether viewed as the statute's best reading or as a reasonable interpretation entitled to deference or persuasive weight, the FCC's conclusion that text messages are "calls" confirms that Plaintiff's claims fall squarely within § 227(c).

## II. The FAC plausibly alleges that AdaptHealth's messages were telephone solicitations and telemarketing, and it states an internal Do Not Call claim.

### A. Messages that steer a stranger to AdaptHealth's commercial website plausibly were sent to encourage the purchase of AdaptHealth's products.

AdaptHealth next argues that Plaintiff has not alleged receipt of a "telephone solicitation" or "telemarketing" because "none of the subject communications, on their face, encouraged Plaintiff to purchase, rent, or invest in anything." (MTD at 17; *see id.* at 15-19.) That argument misstates the governing test and ignores what the FAC actually alleges.

The TCPA defines a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15). The relevant "purpose" is the defendant's purpose in initiating the message. As the Ninth Circuit recently explained,

"[g]iving meaning to the whole definition as drafted requires consideration of the purpose of the initiation of the calls and messages at issue." *Coffey v. Fast Easy Offer, LLC*, 178 F.4th 480, 483 (9th Cir. 2026). That inquiry is not confined to the literal words contained in the communication, nor the relationship between the caller and the callee. "[N]either the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context." *Id.* (quoting *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012)). A court therefore "must consider not only the content of the messages [the plaintiff] received, but also their context as it illuminates Defendants' purpose in initiating the messages." *Id.* And where the plaintiff alleges that "one purpose" of initiating the messages was to encourage the purchase of the defendant's goods or services, that is "enough to satisfy the statutory definition." *Id.* at 484.

Courts in this District apply the same common-sense approach, looking to the content and context of the messages rather than to magic words. *See Shelton v. Nat'l Gas & Elec., LLC*, No. CV 17-4063, 2019 WL 1506378, at *4-*5 (E.D. Pa. Apr. 5, 2019) ("A plaintiff must know the name of the telemarketer that violated the TCPA in order to bring suit against it, and the content of the message can help prove that it was a solicitation."). Indeed, Judge Perez denied a motion to dismiss in *RxLink* that argued, as AdaptHealth does here, that the messages at issue were not telephone solicitations because they did not encourage the recipient to "purchase or invest in" any "property, goods, or services." And courts elsewhere have repeatedly held that messages which direct the recipient to the defendant's commercial website are plausibly telephone solicitations, even where the text of the message does not itself make a sales pitch. *See Suescum v. Fam. First Life, LLC*, No. 6:21-CV-1769-WWB-EJK, 2023 WL 311144, at *3 (M.D. Fla. Jan. 19, 2023) ("Plaintiffs allege that Defendant's text messages prompted them to view a website

encouraging them to purchase warm leads. As a result, the instant case is distinguishable from the cases cited by Defendant because Plaintiff has sufficiently alleged that Defendant's unsolicited texts served as a pretext to commercial activity."); *Miholich v. Senior Life Ins.*, 2022 U.S. Dist. LEXIS 23981, at *15-16 (S.D. Cal. Feb. 10, 2022) (holding as sufficient allegations where "[t]he FAC alleges that the text messages advertised 'Financed Leads,' contained a link to webinar provided by Defendant, and were 'an attempt to promote or sell Defendant's services.'"); *see also Rockwell v. Medicus Healthcare Sols., LLC*, No. 24-CV-128-LJV, 2025 WL 959745, at *4 (W.D.N.Y. Mar. 31, 2025) ("[S]ervices that appear to be free or to offer recruitment opportunities may 'serve as a mere pretext for commercial services.'"); *Chesbro*, 705 F.3d at 918 (call encouraging redemption of free reward points at a store was telemarketing).

Applying those principles here, the FAC readily alleges telephone solicitations. The messages identified AdaptHealth, a national seller of home medical equipment, supplies, and related services, by name. (FAC ¶¶ 20-21, 32-33.) They announced a "new order" to a person who had ordered nothing, was awaiting nothing, and had never asked AdaptHealth to contact him. (FAC ¶¶ 23-28, 32.) And rather than conveying transactional information, they told Plaintiff to call AdaptHealth and, through a link to AdaptHealth's website in the second message, to download AdaptHealth's mobile app on a website, a website where, the FAC alleges, he could purchase and schedule delivery of medical supplies. (FAC ¶¶ 29, 32, 52.) Plaintiff alleges, based on those facts, that the messages were sent "to generate sales, increase traffic to Defendant's website and its affiliate, and promote Defendant's products and brand," and "for the purpose of encouraging the purchase of Defendant's products and services." (FAC ¶¶ 53, 68; *see also id.* ¶¶ 29, 52, 56, 69-70.) Drawing all reasonable inferences in Plaintiff's favor, at least "one purpose" of steering a person with no AdaptHealth relationship to AdaptHealth's phone line, app, and

website was to encourage him to buy what AdaptHealth sells. *Coffey*, 178 F.4th at 484. That is all the statute requires.

This is thus nothing like the cases AdaptHealth cites, in which plaintiffs relied solely on labels without pleading the content of the communications. In *Eggleston*, for example, the plaintiff "simply relie[d] on conclusory labels such as 'advertisement' and 'promotion' without any supporting factual detail," and in *Weingrad*, the plaintiff "only plead[ed]" that "the purpose of the [subject] call was to sell the Plaintiff health insurance." (MTD at 16-17 (quoting *Eggleston v. Reward Zone USA LLC*, 2022 WL 886094, at *7 (C.D. Cal. Jan. 28, 2022), and *Weingrad v. Top Healthcare Options Ins. Agency Co.*, 2024 WL 4228149, at *3-4 (E.D. Pa. Sept. 17, 2024)).) So too in *Dahdah* and the other decisions AdaptHealth string cites, where no content was pled. Here, by contrast, the FAC reproduces the messages themselves, identifies the sender, and alleges where the messages sent the recipient and what AdaptHealth sells there. (FAC ¶¶ 29, 32-33, 48, 52.) That is precisely the further factual enhancement missing in AdaptHealth's cases.

### B. AdaptHealth's "prior transaction" theory raises, at most, a factual dispute that cannot be resolved on the pleadings.

AdaptHealth's principal response is to recharacterize its messages as transactional: they "appear to relate to a purchase that already happened." (MTD at 17.) But Plaintiff never made any purchase from AdaptHealth, and never placed the order that the messages referenced. (FAC ¶¶ 23-29.) There was no transaction between Plaintiff and AdaptHealth for the messages to complete. AdaptHealth's characterization of its own messages is neither alleged in the FAC nor an inference that may be drawn in AdaptHealth's favor at this stage. Whether AdaptHealth initiated the messages, at least in part, to encourage purchases of its products, presents, at minimum, a factual question that cannot be resolved against Plaintiff under Rule 12(b)(6). *See Coffey*, 178 F.4th at 483-84; *Swierkiewicz*, 534 U.S. at 511. Indeed, the FAC meets

AdaptHealth's theory head-on. Plaintiff alleges that he was not awaiting any order, invoice, delivery, appointment, or other transaction from AdaptHealth, and did not recognize the purported "new order" because he had not placed one. (FAC ¶¶ 25-26.) The messages were therefore not sent to confirm, facilitate, complete, or provide information concerning any transaction initiated by Plaintiff, and AdaptHealth's characterization of its solicitation as concerning a purported "order" "did not make the communication transactional because, as to Plaintiff, there was no underlying transaction to facilitate or complete." (FAC ¶¶ 28, 30.)

Nor does any categorical rule make every communication that references an order "transactional." In *Coffey*, the Ninth Circuit reversed a dismissal with prejudice where the messages at issue did not expressly encourage the plaintiff to purchase anything, and it declined to engage with the competing collection of non-binding decisions addressing what constitutes a telephone solicitation, finding that exercise unnecessary because "[the] well-pleaded allegations provide a clear basis for decision at the motion to dismiss stage." 178 F.4th at 482-84 & n.4. The same is true here. The relevant inquiry is AdaptHealth's purpose in initiating the messages, assessed through both their content and their context, and a complaint sufficiently pleads a telephone solicitation where one purpose of the initiation was to encourage the purchase of goods or services. *See id.* at 483-84. Even if some aspect of AdaptHealth's messages referenced an "order," that does not negate the separately alleged promotional purpose of steering Plaintiff to AdaptHealth's website that advertises AdaptHealth's products for purchase.

AdaptHealth's other authorities fare no better. By AdaptHealth's own description, they involved calls made in response to the plaintiff's own inquiry (*Newhart*), calls placed to a wrong number in which the plaintiff was not solicited (*Dukes*), communications that "merely provid[ed] information about an available service" (*Less*), or a summary judgment record concerning

communications intended for the plaintiff's father (*Guglielmo*). (MTD at 17-18.) And *Hulce* is inapposite: there, the calls advertised the availability of free services that the plaintiff already had available to him as part of his insurance. *Hulce*, 132 F.4th at 500. Here, by contrast, AdaptHealth's website sells home medical equipment and supplies of various types, and Plaintiff had no preexisting relationship with AdaptHealth of any kind.

Finally, AdaptHealth's assertion that it "begs credulity" to think that AdaptHealth would "indiscriminately send out 'cold' solicitations" (MTD at 18 n.8) is a factual argument about what AdaptHealth would or would not do. It is not a basis for dismissal. Rule 12(b)(6) is not an appropriate device for testing the truth of what is asserted in the complaint. *See Swierkiewicz*, 534 U.S. at 511. The FAC alleges what AdaptHealth actually did: it sent Plaintiff, a stranger, messages bearing its name that directed him to call AdaptHealth and to visit its website. (FAC ¶¶ 23-33, 52.) If AdaptHealth has evidence that it had some other purpose, it may present that evidence at trial.

### C. Plaintiff states a claim for violation of the internal Do Not Call rules.

#### 1. Continued texting after a stop request supports a reasonable inference that AdaptHealth lacked adequate procedures.

AdaptHealth contends that Count II fails because receiving a message after a do-not-call request is not, by itself, a violation, and because Plaintiff did not request a copy of AdaptHealth's internal Do Not Call policy. (MTD at 19-21.) But AdaptHealth misconstrues the applicable regulation, 47 C.F.R. § 64.1200(d)(3), which can be violated either by (1) refusing to place a plaintiff's number on an internal do-not-call list, or (2) calling a number despite it being on an internal do-not-call list. *See Robison v. 7PN, LLC*, 569 F. Supp. 3d 1175, 1184 (D. Utah 2021); *see also Menin v. Star Markets Co., Inc.*, No. 23-CV-11918-DJC, 2024 WL 4123522, at *5 (D.

Mass. Sept. 9, 2024) (denying motion to dismiss and holding that whether procedures were reasonable was a question for the jury).

And at the pleadings stage, courts routinely hold that a defendant's continued messaging after an acknowledged stop request gives rise to a reasonable inference that it lacked the required procedures. As the Western District of Missouri remarked in rejecting an identical argument, "Plaintiff alleges that she repeatedly instructed Defendant to stop sending her text messages. Despite those instructions, Plaintiff continued to receive text messages. At the motion to dismiss stage, it is reasonable to infer that Defendant did not have internal procedures regarding do not call requests." *Eagle v. GVG Cap., LLC*, No. 22-CV-00638-SRB, 2023 WL 1415615, at *4 (W.D. Mo. Jan. 31, 2023). Even AdaptHealth's own authority, *Laccinole*, declined to dismiss where the plaintiff alleged that he "asked Rocket Mortgage to stop calling him and that he received more than one marketing and/or solicitation phone call within one year from Rocket Mortgage." *Laccinole v. Rocket Mortg., LLC*, 609 F. Supp. 3d 68, 74 (D.R.I. 2022). And *Bailey* is inapposite because there, the plaintiff did "not allege that he made any such affirmative request to Defendant, and therefore it is not clear how the provision was violated." *Bailey v. Domino's Pizza, LLC*, 867 F. Supp. 2d 835, 842 (E.D. La. 2012).

Plaintiff's allegations easily clear that bar, and go well beyond it. Plaintiff did not merely receive an automated STOP reply. He replied "STOP" to AdaptHealth's messages *and then communicated directly with AdaptHealth, whose legal representative confirmed in writing* that his number "has been added to AdaptHealth's internal Do Not Contact list." (FAC ¶¶ 32, 35-36, 39-40.) AdaptHealth therefore had actual knowledge of Plaintiff's request. (FAC ¶ 41.) Yet more than three months later, Plaintiff's number remained available for outbound messaging, and he received another message from Oxygen One, an entity within the AdaptHealth organization.

(FAC ¶¶ 37, 42-43, 55.) Plaintiff alleges that this plausibly demonstrates that AdaptHealth's procedures did not reasonably ensure that a number placed on its internal list would be suppressed from subsequent outbound communications initiated through other AdaptHealth-controlled or AdaptHealth-related messaging channels. (FAC ¶¶ 38, 44-45.) That is a specific, factual theory of what AdaptHealth's procedures lacked: a do-not-call request recorded by AdaptHealth was not honored across AdaptHealth's organization.

And nothing in the regulation, or in Rule 8, requires a consumer to request a copy of a telemarketer's written policy before he may sue; AdaptHealth cites no case so holding. Plaintiff's acknowledgment that the precise architecture of AdaptHealth's suppression systems is within AdaptHealth's possession and control (FAC ¶ 46) is not a concession but a statement of the obvious: a consumer on the receiving end of unwanted texts cannot see inside the sender's systems. Such facts would be in the particular and unique knowledge of the sender. AdaptHealth purports to require the Plaintiff to plead the impossible.

**2. AdaptHealth did not honor Plaintiff's request within the time the regulation allows.**

AdaptHealth also notes that the regulations require telemarketers to honor do-not-call requests within a "reasonable time," not to exceed ten business days, and suggests that requests need only be honored "within a few days or weeks." (MTD at 20.) Even accepting AdaptHealth's description of the rule, it does not help AdaptHealth here. Plaintiff made his request on February 12, 2026, and AdaptHealth confirmed the same day that his number had already been added to its internal list. (FAC ¶¶ 36, 39-40.) The next message arrived on May 31, 2026, more than *three months later*. (FAC ¶¶ 37, 42-43, 48.) No reading of a "reasonable time," and certainly not one capped at ten business days, extends to more than three months. As the

FAC alleges, the May 31 message "was therefore not the result of Defendant merely failing to process Plaintiff's request instantaneously." (FAC ¶ 43.)

Even if the delay had been far shorter, AdaptHealth could not obtain dismissal on this basis. Section 64.1200(d)(3) imposes two separate requirements: the telemarketer must act within a reasonable time, and *under no circumstances may that period exceed the outer limit*. A delay beyond the outer limit is necessarily unreasonable, but the converse does not follow; the statute does not create, and the regulation does not contain, a grace period during which continued telemarketing is categorically lawful.

The majority of courts to address the issue have followed that straightforward reading and rejected the categorical safe harbor theory under the regulation's prior thirty-day limit, and the same logic applies with equal force to the current limit. *See Gill v. Align Tech. Inc.*, No. 21-CV-631-JPS-JPS, 2022 WL 1540016, at *4 (E.D. Wis. May 16, 2022) (holding that the reasonableness of defendant's efforts to honor a do-not-call request presented a question for the jury); *Delgado v. eMortgage Funding, LLC*, No. 21-CV-11401, 2021 WL 4776774, at *5 (E.D. Mich. Oct. 13, 2021) ("Although § 64.1200(d)(3) states that a thirty-day delay in honoring do not call requests is per se unreasonable, it does not state that any shorter delay is per se reasonable."); *Boger v. Citrix Sys., Inc.*, No. 8:19-CV-01234-PX, 2020 WL 1033566, at *5 (D. Md. Mar. 3, 2020) (rejecting the contention that § 64.1200(d)(3) "create[s] a safe harbor for follow up calls placed within thirty days" and holding reasonableness was "a question of fact best left for development in discovery"); *Nece v. Quicken Loans, Inc.*, No. 8:16-CV-2605-T-23CPT, 2018 WL 1326885, at *7 (M.D. Fla. Mar. 15, 2018) (holding that "a jury must decide whether Quicken honored Nece's do-not-call request in a reasonable time"); *Buja v. Novation Cap., LLC*, No. 15-81002-CIV, 2017 WL 10398957, at *6 (S.D. Fla. Mar. 31, 2017) (declining

to determine as a matter of law that a delay of two or three weeks was reasonable); *Martin v. Comcast Corp.*, No. 12 C 6421, 2013 WL 6229934, at *6 (N.D. Ill. Nov. 26, 2013) (same, one to two weeks).

As *Gill* recognized, the reasonableness inquiry necessarily depends upon how the defendant actually processes do-not-call requests. If a defendant's system permits it to "easily and immediately remove a person from a call list," a jury could conclude that even a much shorter delay was unreasonable. *Gill*, 2022 WL 1540016, at *4. Here, AdaptHealth confirmed to Plaintiff on the day he asked that his number had already been added to its internal list. (FAC ¶¶ 36, 40.) That confirmation supports a reasonable inference that AdaptHealth's system received, recognized, and processed Plaintiff's request immediately—and that the later message was not the product of processing time at all, but of procedures that failed to carry the request across AdaptHealth's organization. (FAC ¶¶ 43-45.) At a minimum, whether AdaptHealth acted reasonably turns on facts that cannot be resolved against Plaintiff on the face of the FAC.

#### 3. Plaintiff alleges more than one message sent in violation of the internal Do Not Call rules.

Lastly, AdaptHealth argues that Count II fails because Plaintiff alleges only one message after his opt-out request, while section 227(c)(5) requires "more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations." (MTD at 21.) But that argument cannot be squared with AdaptHealth's own theory of the internal Do Not Call rules. As AdaptHealth's own authority holds, the violation of those regulations is therefore "the initiation of the phone call without having implemented the minimum procedures". *Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 629, 632 (6th Cir. 2009) (quoted in MTD at 19).

The FAC does not allege merely a failure that arose after Plaintiff opted out. It alleges that the subsequent violation plausibly demonstrates that AdaptHealth had not implemented or

maintained the required procedures in the first place. Taken as true, then every telemarketing message AdaptHealth initiated without having the required procedures in place, not only the message sent after Plaintiff's request, was a violation. Besides, Plaintiff alleges that he received three messages within a twelve-month period, two from AdaptHealth on February 12, 2026, and one from Oxygen One on May 31, 2026, and pleads facts supporting the inference that AdaptHealth lacked the required procedures throughout, all without consent. (FAC ¶¶ 31-32, 37-38, 44-45, 48, 55.) That is "more than one telephone call within any 12-month period … in violation of the regulations." 47 U.S.C. § 227(c)(5). Count II should proceed.

## III. The FAC plausibly alleges that AdaptHealth directly sent the text messages that bear its name.

AdaptHealth's final argument is that Plaintiff has not plausibly alleged that AdaptHealth, rather than someone else, sent the messages. (MTD at 21-29.) In essence, AdaptHealth attempts the classic "we didn't do it" defense by disguising it as a challenge to the Plaintiff's allegations of direct liability at the pleadings stage. Rule 12(b)(6) is not an appropriate device for testing the truth of what is asserted in the complaint. *Swierkiewicz*, 534 U.S. at 511. And AdaptHealth's argument is a red herring that begs the question "who did, then?" *See Consol. Grain & Barge, Inc. v. Anny*, No. CIV.A. 11-2204, 2013 WL 486687, at *6 (E.D. La. Feb. 6, 2013).

### A. Messages that identify AdaptHealth, announce an AdaptHealth order, and direct the recipient to AdaptHealth's phone line, app, and website plausibly came from AdaptHealth.

A person need not physically dial a call to be directly liable; a caller initiates a call if it "take[s] the steps necessary to physically place a telephone call." *In re Dish Network*, 28 FCC Rcd. 6574, 6583 (2013). At the pleadings stage, a plaintiff need only plead facts that permit a reasonable inference that the defendant did so. Plaintiff has done that. The messages identified

AdaptHealth by name, announced an AdaptHealth "new order," told Plaintiff to call AdaptHealth at a specified number during specified business hours, directed him to download AdaptHealth's mobile app from AdaptHealth's own website, and told him how to opt out of AdaptHealth's messaging campaign. (FAC ¶¶ 32-33.) When Plaintiff replied "STOP," he was told he had been unsubscribed. (FAC ¶ 32.) And when Plaintiff contacted AdaptHealth directly, AdaptHealth, not some third party, responded and confirmed in writing that it had added his number to AdaptHealth's internal Do Not Contact list. (FAC ¶¶ 35-36, 40.) Based on these facts, Plaintiff alleges that the messages were transmitted through a messaging system operated by AdaptHealth. (FAC ¶¶ 33-34.) Taken together, and taken as true, those facts plausibly show that AdaptHealth sent the messages.

Direct identification by name is the strongest indicia of direct liability there is, and courts in this District have repeatedly so held. In *Smith v. Am.-Amicable*, the court held that "if true, Plaintiff's allegation that he was informed during both prerecorded calls that he was speaking with American-Amicable supports a plausible inference that Smith was indeed called by or on behalf of American-Amicable," together with allegations that the calls "concerned insurance benefits-American-Amicable's area of business." 2022 WL 1003762, at *2. And in *Direct Building Supplies*, one of AdaptHealth's principal authorities, this Court explicitly identified the very facts that would suffice: allegations "that Direct Building Supplies' name appeared in the caller ID on Smith's cellular phone, the persons with whom Smith spoke identified themselves as representatives of Direct Building Supplies, or the services these persons attempted to sell were construction or home contracting services." *Smith v. Direct Building Supplies*, No. CV 20-3583, 2021 WL 4623275, at *3 (E.D. Pa. Oct. 7, 2021). Here, the messages themselves identified AdaptHealth and its subsidiaries, directed the Plaintiff to AdaptHealth's contact channels, and

they concerned AdaptHealth's area of business: home medical equipment and supplies. (FAC ¶¶ 20-21, 32-33, 48.) Plaintiff has pled precisely what *Direct Building* said would have been sufficient.

Courts elsewhere agree, particularly where, as here, the message both identifies the defendant and directs the recipient to the defendant's website. In *Barry v. Firstsource Sols. USA, LLC*, the court denied a motion to dismiss on exactly that basis:

> In the Complaint, Barry alleges that the calls placed from January to February 2023 began with a prerecorded voice and the speaker self-identified as calling from Firstsource. (Compl. ¶¶ 19, 27). Barry has also alleged that the voice message directed the recipient to Firstsource's website, pointing to the existence of an "apparent relationship," that meets the required threshold at this stage. (Compl. ¶¶ 21-22); see *Hodgin*, 2015 WL 13022289, at *2. Taking these allegations as true, Barry has stated a TCPA claim by alleging that these calls were directly initiated by Firstsource.

No. 3:24-CV-00648-GNS, 2025 WL 1762289, at *3 (W.D. Ky. June 25, 2025). *See also Bradshaw*, 763 F. Supp. 3d at 646 ("[W]hen a person introduces herself across the table as Olivia or Emma --- we generally conclude without much hesitation that is indeed who she is."); *Katz v. CHW Grp., Inc.*, No. 5:22-cv-5198, 2023 WL 6445798, at *4 (W.D. Ark. Sept. 29, 2023) ("The Court does not see what more could possibly be necessary or useful for supporting a reasonable inference at the pleading stage that CHW was, indeed, the entity ultimately responsible for placing these calls to Mr. Katz."); *Fridline v. Int. Media, Inc.*, No. 24-CV-01770, 2025 WL 1162492, at *2 (M.D. Pa. Apr. 21, 2025) ("Plaintiff has adequately connected the numbers to Defendant through the content of the messages. . . . While the area codes are not associated with Missouri, the content of the messages sufficiently connects them to Interest Media.").

Several of AdaptHealth's own citations actually support Plaintiff. In *Frank v. Cannabis & Glass, LLC*, the seller was named in the text messages, and the complaint was devoid of any facts indicating that Springbig, a cannabis marketing platform, sent them; the case was dismissed

as to Springbig but permitted to proceed against the named seller. No. 2:19-CV-00250-SAB, 2019 WL 4855378, at *2 (E.D. Wash. Oct. 1, 2019). Likewise, in *Meeks v. Buffalo Wild Wings, Inc.*, the court dismissed claims against another company, Yelp, where the plaintiff's allegations indicated that a restaurant initiated the text messages, and allowed the plaintiff's claims against the restaurant to proceed. No. 17-CV-07129-YGR, 2018 WL 1524067, at *4 (N.D. Cal. Mar. 28, 2018). Here, Plaintiff has sued the entity named in the messages, not a platform or phone company. The same is true of *Sheski*, where the plaintiff sued Shopify, an online shopping cart platform, for text messages sent by one of the add-on apps, and *Wick*, where the plaintiff attempted to sue a call initiator's phone company. *Sheski v. Shopify (USA) Inc.*, No. 19-CV-06858-HSG, 2020 WL 2474421, at *2 (N.D. Cal. May 13, 2020); *Wick v. Twilio Inc.*, No. C16-00914RSL, 2017 WL 2964855, at *4 (W.D. Wash. July 12, 2017).

AdaptHealth's remaining cases involved plaintiffs who pled no facts connecting the defendant to the calls, or who pled facts pointing to someone else. In *Aaronson*, the complaint was "devoid of facts such as how the caller identified itself, the substance of the calls, or any other details from the telephone calls." *Aaronson v. CHW Grp., Inc.*, No. 1:18-CV-1533, 2019 WL 8953349, at *2 (E.D. Va. Apr. 15, 2019). In *Smith v. Vision Solar LLC*, the plaintiff simply made the conclusory allegation that the telephone number was "confirmed to belong to Defendant," and the court granted leave to amend. No. CV 20-2185, 2020 WL 5632653, at *3 (E.D. Pa. Sept. 21, 2020). In *Doyle v. GoHealth, LLC*, the agent stated that she worked for GoHealth but in the same breath "listed a bunch of insurance companies that her company works with." No. CV 22-04291, 2023 WL 3984951, at *1 (D.N.J. Mar. 30, 2023). In *Rogers*, the defendant Boomsourcing was not mentioned on the calls at all. *Rogers v. Assurance IQ, LLC*, No. 2:21-CV-00823-TL, 2023 WL 2646468, at *5 (W.D. Wash. Mar. 27, 2023). In *Brownlee*,

the plaintiff was unable to identify the defendant on three of six calls, and only those unidentified calls were dismissed. *Brownlee v. Allstate Ins. Co.*, No. 21-CV-1428, 2021 WL 4306160, at *1 (N.D. Ill. Sept. 22, 2021). In *Dobronski*, the plaintiff conceded that he did not know the identity of the telemarketers who initiated the calls. *Dobronski v. Anthony J. Russo, Jr., PA*, No. 2:23-CV-12288, 2024 WL 4363118, at *5 (E.D. Mich. Sept. 30, 2024). And *Belleville* turned on the plaintiff's failure to plead the contents of the sales pitch, and the report and recommendation was adopted only in part. *Belleville v. Florida Ins. Serv's., Inc.*, No. 23-CV-14369-AMC/SMM, 2024 WL 2342337, at *4 (S.D. Fla. May 23, 2024), *report and recommendation adopted in part, rejected in part*, No. 23-14369-CIV, 2024 WL 2794108 (S.D. Fla. May 31, 2024). The balance of AdaptHealth's citations, by their own descriptions, involved voice calls from callers who merely claimed some association with the defendant or mentioned its products. (MTD at 24, 27-28 & n.11.) None involved, as here, written messages authored in the defendant's own name, concerning the defendant's own purported order, that sent the recipient to the defendant's own phone line, app, and website.

Tellingly, AdaptHealth offers no explanation for why Plaintiff received messages identifying AdaptHealth, announcing an AdaptHealth order, and, in one instance, linking to AdaptHealth's website, or why AdaptHealth's own legal representative responded to Plaintiff's complaint about them by confirming that his number had been added to AdaptHealth's internal list, if AdaptHealth did not send them. AdaptHealth, and only AdaptHealth, is in a position to identify any contrary facts. It may dispute Plaintiff's allegations, but that is a merits question for trial, not a basis for dismissal.

**B. Plaintiff's alternative allegations do not undermine his well-pled direct liability theory.**

AdaptHealth devotes much of its argument to the FAC's references to "affiliates," "agents," "vendors," and "other persons or entities which discovery may reveal." (MTD at 25-26.) But those references appear in the FAC's description of AdaptHealth's failure to maintain its internal Do Not Call procedures across its systems, its class definitions, its explanation of how class members may be identified, and its prayer for injunctive relief. (FAC ¶¶ 44, 46, 75, 88, 95.) They do not contradict the FAC's specific factual allegations that AdaptHealth sent the messages at issue. (FAC ¶¶ 31-34.) At most, they reflect that discovery might reveal that third parties might also be liable for the conduct alleged, for example, if AdaptHealth outsourced its opt-out processing to a vendor that failed to honor Plaintiff's request. Such a circumstance would nevertheless be consistent with a finding of direct TCPA liability against AdaptHealth.

This is simply a case of Plaintiff pleading in the alternative, which the Federal Rules expressly permit: "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." FED. R. CIV. P. 8(d)(2). And "[a] party may state as many separate claims or defenses as it has, regardless of consistency." FED. R. CIV. P. 8(d)(3); *see also Slaughter v. Bass Pro, Inc.*, 648 F. Supp. 3d 1108, 1123 (W.D. Mo. 2023) (permitting alternative claims to proceed). Pleading in the alternative in no way undermines the well-pled allegations that AdaptHealth directly sent the text messages at issue.

The same is true of the third message. The FAC alleges that the May 31, 2026 message was sent by Oxygen One, "an entity that is part of the AdaptHealth organization," "an entity operating within the AdaptHealth corporate organization," and an entity "operating under

[AdaptHealth's] corporate umbrella." (FAC ¶¶ 37, 51, 55.) Those allegations do nothing to undermine the plausible inference that AdaptHealth sent the two February 12 messages that bear its own name, which, standing alone, constitute "more than one telephone call within any 12-month period by or on behalf of the same entity" for purposes of Count I. 47 U.S.C. § 227(c)(5). And as to the May 31 message, the distinction AdaptHealth draws between itself and an entity within its own corporate organization is one without a difference at this stage. *See Havassy v. Keller Williams Realty, Inc.*, No. CV 21-4608, 2024 WL 1640984, at *6 (E.D. Pa. Apr. 16, 2024) ("[t]hat may be so, but that does not mean they are unrelated."). Indeed, the FAC's theory of Count II is precisely that AdaptHealth's procedures failed to carry Plaintiff's request across "the systems, business units, affiliated entities, and persons used to communicate with consumers on AdaptHealth's behalf." (FAC ¶ 44.) Pleading that AdaptHealth's failure manifested through an affiliate is not an inconsistency. It is the violation.

Nor does the FAC's acknowledgment that certain facts will be "established through discovery" doom Plaintiff's claims. (MTD at 29.) Plaintiff is not a party "armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79. He has pled the content of the messages, the identity of the sender stated in them, the website to which they directed him, AdaptHealth's response to his email, and the timing of his request and the message that followed. (FAC ¶¶ 23-36, 38-48.) The only facts the FAC identifies as awaiting discovery, the "precise architecture" of AdaptHealth's systems and the identity of the persons responsible for maintaining them (FAC ¶ 46), are facts exclusively within AdaptHealth's control. As another court explained in denying a similar motion, "it would otherwise be impossible for [the plaintiff] to know of the alleged caller's relationship with Firstsource—if any—without discovery, but pleading the existence of an 'apparent relationship' is sufficient." *Barry*, 2025 WL 1762289, at *2.

### C. Alternatively, the FAC plausibly alleges vicarious liability.

Plaintiff's primary theory is that AdaptHealth sent the messages itself. But even if AdaptHealth used some third part to transmit them, the same facts plausibly support vicarious liability. Any further details regarding the nature of an agency relationship (if any) will be the proper subject of discovery and need not be pled at the pleadings stage; facts which may plausibly be read as giving rise to the inference of the existence of an agency relationship are sufficient. *Mauer v. Am. Intercontinental Univ., Inc.*, 2016 U.S. Dist. LEXIS 120451, at *2 (N.D. Ill. Sep. 7, 2016) (holding a plaintiff must only "allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts"). "[E]xplicit pleading of an agency relationship is not required." *Harrison v. Humana, Inc.*, No. 3:24-cv-00262-GNS, 2024 WL 4828737, at *3 (W.D. Ky. Nov. 19, 2024) (citing *Eldridge v. Cabela's Inc.*, No. 3:16-CV-536-DJH, 2017 WL 4364205, at *5 (W.D. Ky. Sept. 29, 2017)). The same is true of the May 31 message, which the FAC alleges Defendant sent through Oxygen One, an entity within AdaptHealth's corporate organization. (FAC ¶¶ 37, 55.) Messages sent in AdaptHealth's name, concerning AdaptHealth's purported order, that direct the recipient to AdaptHealth's own website, and about which AdaptHealth itself corresponded with Plaintiff, and other messages sent from what are pled to be other members of that same corporate structure plausibly reflect, at minimum, an "apparent relationship" between AdaptHealth and whoever physically transmitted them. *See Barry*, 2025 WL 1762289, at *2-3.

## IV. Any dismissal should be without prejudice and with leave to amend.

AdaptHealth asks that any dismissal be with prejudice because Plaintiff has already amended once. (MTD at 30.) But Plaintiff amended in response to AdaptHealth's first motion before any ruling from this Court, and the Court has not yet identified any deficiency in

Plaintiff's pleading. Should the Court nonetheless find any of Plaintiff's allegations lacking, it should grant leave to amend. *See* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave when justice so requires."). Plaintiff can, for example, plead additional detail regarding the content of AdaptHealth's website and the products advertised there, the number provided in the messages, and the timing and substance of his communications with AdaptHealth.

**Conclusion**

For all of the foregoing reasons, AdaptHealth's motion to dismiss should be denied in its entirety. The TCPA's text, structure, purpose, and the decisions of the courts of this Circuit all confirm that text messages qualify as "telephone calls" under § 227(c). The FAC plausibly alleges that AdaptHealth's messages were telephone solicitations, that AdaptHealth failed to honor Plaintiff's do-not-call request, and that AdaptHealth sent the messages that bear its name. Alternatively, Plaintiff should be granted leave to amend to cure any deficiency the Court may identify.

Dated: October 1, 2026

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq. (PA Bar 333687)
Perrong Law LLC
1669 Edgewood Road, Suite 218
Yardley, PA 19067
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

October 1, 2026

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.